## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Garth Hamelin, being duly sworn, hereby depose and state as follows:

1. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I have been employed as a Special Agent of the United States Drug Enforcement Administration ("DEA") since 2002. I am currently assigned to the DEA's New England Field Division, where I have been since September 2007. I was previously assigned to the Dallas Field Division, Oklahoma City District Office, where I primarily investigated organized narcotics traffickers. Over the course of my career as a DEA Special Agent, I have participated in numerous narcotics investigations, including at least ten federal wiretap investigations of narcotics-trafficking organizations involved in domestic and international importation and distribution of kilogram amounts of cocaine, heroin, fentanyl and methamphetamine. Through the course of these investigations I have served as the affiant on dozens of federal wiretaps.

3. Before joining the DEA, I served as a police officer with the Manchester, New Hampshire Police Department, and the Los Angeles Police Department. I have a Bachelor of Science Degree in Criminal Justice from Northeastern University.

4. During the course of my employment with the DEA, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities. Over the course of my career in law enforcement, I have debriefed numerous defendants, informants, and witnesses with personal knowledge about narcotics trafficking and the operation of narcotics-trafficking organizations. I

have personally participated in all aspects of narcotics-trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, conducting court-authorized interceptions of wire communications, and obtaining and executing arrest and search warrants.

5. Based on my training and experience, I am familiar with methods of operation used by narcotics traffickers, including the methods they use to distribute, store, and transport narcotics, and to collect, expend, account for, transport, and launder drug proceeds. Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.

6. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and often use text messages or messaging applications like BlackBerry Messenger (BBM) and WhatsApp in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations. Based

on my training and experience, I am familiar with methods of operation used by narcotics traffickers, including the methods they use to distribute, store, and transport narcotics, and to collect, expend, account for, transport, and launder drug proceeds.

7. I have participated in the below-described investigation since June 2016. I am familiar with the facts and circumstances of this investigation based on information I have received from a variety of sources, including other law enforcement officers and agents, confidential sources, cooperating witnesses, public records, financial records, physical and video surveillance, telephone toll records, and court authorized wire intercepts. Because this affidavit is being submitted for the limited purpose of seeking authorization to search each of the target premises described below, I have not presented each and every fact learned during this investigation, and only rely on the facts that are presented herein.

### PROBABLE CAUSE THAT SANTO RUIZ NIVAR CONSPIRED TO POSSESS FENTANYL WITH INTENT TO DISTRIBUTE

8. While executing a search warrant this morning at 17 Spring Street, Lawrence, Massachusetts, 17-mj-2212-MBB, investigators located Santo Ruiz Nivar, a/k/a TIO. He was in a finished basement apartment, the only male in the apartment, sleeping on a couch next to a coffee table where his wallet, containing his Dominican license and passport, and a telephone were found. At 6:31 a.m., investigators called the telephone used by TIO, (603) 858-0478, during the wiretap investigation, and the telephone on the coffee table rang. Under the couch were approximately 10 grams of suspected fentanyl and approximately $15,000 in suspected drug proceeds. Intercepted calls on (603) 858-0478 provide probable cause to believe that TIO conspired with others to possess with intent to distribute fentanyl:

    A.    On May 5, 2017, at approximately 7:31 p.m. (Session 56), CABALLITO made an outgoing call on TT#11 to Target Telephone 0478, and spoke to

3

TIO. CABALLITO said, "Oh, that little blue one, did you check it?" TIO said, "No." CABALLITO said, "What did they tell you?" TIO said, "That's killing people." CABALLITO said, "Yeah." TIO said, "Listen, that's killing people, I already told you. CABALLITO said, "I check it already...because I gave it to someone who is very picky; I gave it to them at nine, and it passed." CABALLITO said, "A friend of mine told that the blue on is good, but it kills a lot of people [chuckles]." Based on my training and experience and knowledge of this investigation, "blue" appears to refer to "blue fentanyl," a relatively new narcotic being sold to addicts, which CABALLITO provided in a 9:1 ratio of additive to the narcotic ("gave it to them at a nine"), to cut the drug sufficiently that it didn't "kill people."

B. On May 15, 2017, at approximately 1:39 p.m. (Session 3082), CABALLITO placed an outgoing call on TT#11 to Target Telephone 0478, and spoke to TIO. CABALLITO said, "Okay, is the little blue on still around?" TIO said, "No. I have to...they're waiting." CABALLITO said, "That little blue one broke records." TIO said, "Yes, that's the one coming again." CABALLITO said, "Okay, I'll call you back then." Based on my training and experience, "the little blue one" refers to blue fentanyl.

C. On May 16, 2017, at approximately 1:49 p.m. (Session 3451), CABALLITO placed an outgoing call on TT#11 to Target Telephone 0478, and spoke to TIO. CABALLITO said, "And the people are asking me for the little blue one." TIO said, "Oh but everyone...that's what people are waiting on me for." CABALLITO said, "Yes, the little blue one." TIO said, "I'm waiting for the people to see if they call me between today and tomorrow." CABALLITO said, "Are they going to give that one?" TIO said, "Yes, because I met with them..." TIO said, "its a little bit more expensive that the other one, but it doesn't matter." CABALLITO said, "...that blue one...after one squares it away...how should it go...one can put 20 on top to square it away, and it passes. . . . that blue one is dangerous." TIO said, "but there's another one stronger than that one too...a pink one." CABALLITO said, "I was even scared of that one." Based on my training and experience, I believe that "one can put 20 on top" refers to how much cut or additive can be added to the "blue one" without hurting the quality of the narcotics for customers.

## CONCLUSION

9.    For the foregoing reasons, I have probable cause to believe that Santo Ruiz Nivar, a/k/a Tio, conspired to possess with intent to distribute fentanyl, in violation of 21 U.S.C. § 846, and I seek a complaint and arrest warrant for Santo Ruiz Nivar, a/k/a Tio.

GARTH HAMELIN
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
this 30th day of May, 2017

HONORABLE MARIANNE B. BOWLER
United States Magistrate Judge
District of Massachusetts